UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FRANCISCO CERVANTES, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WEST END 3199 REO LLC, et al.,<br><br>Defendants. | Case No.17-cv-06100-VKD<br><br>**ORDER GRANTING IN PART AND DENYING IN PART BAYVIEW DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>Re: Dkt. No. 132 |

Plaintiffs Francisco Cervantes and Maria Elena Velazquez-Cervantes sue for alleged violations of California law in connection with their mortgage loan for certain property located in San Jose, California ("Property"). They claim that after they signed a loan modification agreement, defendants fraudulently altered material terms of the document, which ultimately caused them to lose the Property in foreclosure. The operative Second Amended Complaint ("SAC") asserts four claims for relief: (1) fraudulent alteration of loan documents; (2) negligence; (3) breach of contract; and (4) wrongful foreclosure. The first claim is asserted against defendants Bayview Loan Servicing, LLC ("BLS") and Bayview Fund Acquisitions, LLC ("BFA") (collectively, "Bayview defendants").[1] The second and third claims are asserted only against BLS.

---

[1] The SAC no longer names Julie Butera as a defendant and asserts no claims against her. Additionally, plaintiffs assert the fourth claim for wrongful foreclosure only against defendants West End 3199 REO LLC, West End Trust 2012-1, and LNR Partners, LLC (collectively, "West End defendants"). The West End defendants join in the Bayview defendants' motion to dismiss. Dkt. No. 133. They have also affirmatively moved to dismiss the SAC, and the Court will address the West End defendants' motion in a separate order.

The Court's jurisdiction is based on diversity. 28 U.S.C. § 1332.[2]

The Bayview defendants now move to dismiss the SAC for failure to state a claim for relief, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiffs oppose the motion. Upon consideration of the moving and responding papers, as well as the oral arguments presented, the Court grants the motion in part and denies it in part.

**I.　BACKGROUND**

The following background facts are drawn from the SAC and, solely for purposes of resolving the present motion, are deemed true:

In August 2007, plaintiffs purchased the Property and borrowed $540,000 from Lehman Brothers Bank ("Lehman") pursuant to a deed of trust ("DOT") and Promissory Note ("Note"). In conjunction with that transaction, plaintiffs also obtained a loan from the U.S. Small Business Administration in the amount of $432,000. The Property is a two-story, four-unit mixed-use owner-occupied structure. The two upper units are for residential use, and the two lower units are for commercial use. Plaintiffs live at the Property and also operate their business there. Dkt. No. 130 ¶¶ 5-10.

Around May 5, 2009, Lehman assigned the DOT, along with the Note, to defendant BLS, effective March 31, 2009. *Id*. ¶¶ 11-12.

Several years later, on January 14, 2013, BLS recorded an assignment of the DOT and Note to BFA. The assignment is dated August 3, 2012 with an effective date of July 31, 2012. *Id*. ¶ 13.

BFA then assigned the DOT and Note to defendant West End Trust 2012-1 ("West End Trust"). The assignment is dated August 3, 2012 with an effective date of July 31, 2012, and was recorded on or about January 14, 2013. *Id*. ¶ 14.

On August 6, 2014, West End Trust recorded an assignment of the DOT and Note to

---

[2] As discussed below, First American Title Insurance Company previously was a named defendant, but has since been voluntarily dismissed. All remaining parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

2

defendant West End 3199 REO LLC ("West End 3199"). The assignment is dated July 23, 2014. *Id*. ¶ 15.

According to the SAC, the Note provided for an adjustable rate mortgage, consisting of 62 fixed monthly payments of $4,353.00 (principal and interest) for the first five years. Beginning in January 2013, plaintiffs would be required to make 298 additional payments, i.e., 297 monthly payments of $4,947.98 (principal and interest), and one final payment of $4,947.10 (principal) in October 2037. *Id*. ¶¶ 23-24. Plaintiffs further allege that, pursuant to a payment clause in the original Note, beginning in January 2013, their monthly payments would be subject to interest rate adjustments based on the London Interbank Offered Rate ("LIBOR") quarterly index, plus a 5% margin. *Id*. ¶¶ 25-26.

In June 2009, after assignment of the DOT and Note to BLS, plaintiffs obtained a loan modification. In an email to plaintiffs, Julie Butera, a BLS Senior Asset Manager, stated that the modified loan terms provided for a 4% fixed interest rate for two years. *Id*. ¶ 29. In a telephone conversation with Ms. Butera, Mr. Cervantes asked what would happen after two years. Ms. Butera reportedly responded that pursuant to the loan modification terms "paragraph (c)," after two years at a 4% interest rate, "[plaintiffs] will have a 1% increase (as maximum) for the remainder of the term." *Id*. ¶ 30. Plaintiffs allege that the executed loan modification agreement with BLS "became part of the modified Note." *Id*. ¶ 32.

Section 1(b) of the modified loan agreement provided that, beginning August 1, 2009, plaintiffs' new monthly payment (principal, interest, and estimated escrow payment) would be $4,423.43:

> (b) New Monthly Payments, Payment Adjustments:
>
> Effective with the Borrower's monthly payment due 08/01/2009, Borrower's monthly principal and interest payment will be $2,871.59. The estimate monthly escrow payment will be $1,551.84. All payments received by Servicer will be credited towards amounts due under the loan.

*Id*. ¶ 33. Plaintiffs allege that while the original Note contained a payment clause providing for adjustments to their monthly payments based on an additional 5% margin, the modified loan agreement did not provide for any additional or further payment adjustments "regarding the

3

margin." *Id*. As such, plaintiffs contend that Section 1(b) of the modified loan replaced the payment section of the original Note and essentially eliminated the additional 5% margin, thereby setting the monthly payment amount at $4,423.43 for the remainder of the loan period.

The SAC goes on to allege that Section 1(c) of the modified loan agreement provided for a new interest rate as follows:

> (c) New Interest Rate
>
> Effective on 07/01/2009, Borrower's rate of interest will be 4.00% and will adjust to the terms of the original note and the note will control the interest rate for the remainder of the term. The annual increase in the interest rate will be capped at 1% for the remainder of the term.

*Id*. ¶ 34. Plaintiffs note that, despite what Ms. Butera stated in her email, the modified loan agreement does not say that the 4% rate applies only for the first two years. While they acknowledge that the original Note provided for adjustments to their interest rate based on the LIBOR quarterly index, as discussed above, plaintiffs contend that the modified loan agreement eliminated the added 5% margin regarding adjustments to their monthly payments. Thus, plaintiffs claim that Section 1(c) of the modified loan means that (1) beginning on October 1, 2009, their interest rate would adjust to 4% plus LIBOR, *without* an additional 5% margin, and (2) any increase in the annual interest rate would be capped at 1%. *Id*. Plaintiffs claim that in the period leading up to the foreclosure of the Property, the LIBOR quarterly index was never more than 1%, and the annual increases in their interest rate never exceeded the 1% cap. *Id*. ¶ 160.

In sum, plaintiffs contend that, properly interpreted, the loan modification agreement provided that, for the remainder of the loan term, their monthly payments would be $4,423.43, and the interest charged on their loan should not have been more than 5% (4% plus LIBOR, up to 1%). The SAC further alleges that the modified loan was set to mature on July 1, 2039, "on which date any unpaid interest and all other sums due shall be paid in full." *Id*. ¶ 35.

Additionally, the loan modification agreement contained the following provisions, essentially prohibiting any changes to the loan modification agreement terms, except by a writing signed by all parties:

4

1.  6. NO OTHER CHANGES

. . . . Nor shall this Agreement in any way impair, diminish, or affect any of the Borrower's rights or remedies in the Security Instrument whether such rights or remedies arise herein or by operation of law. Any inserted terms, changes or additions to this Agreement will immediately render it null and void. Borrower is encouraged to review this Agreement with his/her legal advisor prior to signing it, . . . .

8. NO ORAL MODIFICATION

This Agreement may not be amended or modified in any way except by a written instrument executed by **all** the parties hereto.

*Id*. ¶¶ 36-37.

Plaintiffs allege that sometime between June 23, 2009, when their loan modification agreement was executed, and August 1, 2012, when the DOT and the Note were assigned to West End Trust, the Bayview defendants surreptitiously altered the modified loan agreement. *Id*. ¶¶ 38-43. As discussed above, plaintiffs say that the modified loan agreement they signed contained the following Section 1(c) concerning their interest rate:

(c) New Interest Rate

Effective on 07/01/2009, Borrower's rate of interest will be 4.00% and will adjust to the terms of the original note and the note will control the interest rate for the remainder of the term. The annual increase in the interest rate will be capped at 1% for the remainder of the term.

Dkt. No. 130, Ex. A at ECF 41. They claim that this provision was altered to read as follows:

(c) New Interest Rate

Effective on 07/01/2009 to 07/01/2010, Borrower's rate of interest will be 4.00%. Effective on 07/01/2011, Borrower's rate of interest will be 5.00%. Effective on 07/01/2012, Borrower's rate of interest will be 6.00%. Effective on 07/01/2013, Borrower's rate of interest will be 7.00%. Effective on 07/01/2014, the interest rate will adjust according to the terms of the note and the note will control the interest rate for the remainder of the term (with the exception that the highest interest rate will not exceed 8.89%. The annual increase in the interest rate will be capped at 1% for the remainder of the term).

*Id*., Ex. B at ECF 47. According to the SAC, without plaintiffs' knowledge and "by the means of electronic scissoring/cutting and/or scanning sections of a valid and true document," this altered Section 1(c) was inserted into the loan modification agreement plaintiffs signed. *Id*. ¶ 41.

5

Plaintiffs claim that, even upon casual observation of the two documents, the alteration is obvious. Aside from the clearly different text, plaintiffs note that the typeface on the alleged altered document seems to have been reduced in order to make the additional language fit within the same page as the modification agreement plaintiffs say they signed. *Id*. ¶ 42, Exs. A, B.

The alleged alteration reportedly was not revealed until October 27, 2014, when Ana Castro, an LNR Partner Asset Manager,[3] submitted a declaration containing the altered provision in one of plaintiffs' then-pending bankruptcy matters. *Id*. ¶ 39. However, plaintiffs contend that they did not realize that this loan term had been altered until sometime around the end of April 2015 or the beginning of May 2015 when Mr. Cervantes reviewed the loan documents. *Id*. ¶¶ 128-129.

Meanwhile, within the first two years of the loan modification period (when all parties seem to agree that the 4% interest rate was in effect), plaintiffs missed two monthly mortgage payments—in December 2010, and then again in May 2011. *Id*. ¶ 44. According to plaintiffs, those two missed payments put them $8,846.86 behind on their monthly payments. *Id*. ¶ 45.

Plaintiffs filed their first Chapter 13 bankruptcy matter on or about June 21, 2011. That case was dismissed around March 25, 2013. Plaintiffs later filed a petition for Chapter 7 bankruptcy on or about July 12, 2013, and that matter was discharged around October 22, 2013. *Id*. ¶ 45. Plaintiffs say that during their bankruptcy proceedings, they did not miss any additional monthly payments. *Id*.

Beginning in July or August 2012, while their Chapter 13 bankruptcy proceeding was still pending, plaintiffs say that they stopped receiving monthly statements. After several months passed without receipt of any statements, plaintiffs say they repeatedly asked for periodic statements so they could resolve issues regarding their past due amounts. Communications with defendants reportedly were unproductive. *Id*. ¶¶ 46-49.

On March 14, 2013, plaintiffs received a list showing the history of their loan payments.

---

[3] Ms. Castro and LNR Partners, LLC are identified among a group of "servicers and/or employees" that reportedly had access to plaintiffs' loan documents and relevant information. Dkt. No. 130 ¶ 19.

*Id*. ¶ 48. Although the list did "not [have] much information of the amounts in arrears and additional details related to the loan," Mr. Cervantes noticed that plaintiffs were being charged late fees every month. *Id*.

The SAC indicates that in March 2013, plaintiffs received a statement from the servicer, LNR AFIS Asset Services, LLC, showing that the total past due amount on their loan (including principal, interest, escrow payments and late fees) was $24,666.96. The statement provided a website where plaintiffs could access information about their loan. Plaintiffs registered on the website, but were unable to access information about their mortgage because their loan was "flagged as Special Serviced." *Id*. ¶¶ 51-55. Plaintiffs allegedly were told by Stacey Barnes, a loan specialist at servicer Midland Loan Services,[4] that information for "Special Serviced" loans could not be accessed online. *Id*. ¶ 56.

When Mr. Cervantes asked Ms. Barnes what plaintiffs could do to bring their loan current, Ms. Barnes referred him to Ms. Castro, who as noted above, was an LNR Partner Asset Manager. *Id*. ¶ 58. Plaintiffs allege that they kept calling Ms. Castro for possible solutions to their situation, but she failed to communicate with them in good faith or to inform them about possible foreclosure prevention alternatives. *Id*. ¶¶ 59-60, 63.

In July 2013, plaintiffs received a letter advising that a notice of default would be recorded. Plaintiffs say that they nevertheless continued to make their "regular monthly mortgage payments as scheduled" and were told not to worry when they asked Ms. Castro about a possible repayment plan to resolve their situation. *Id*. ¶¶ 60-61.

Some eight months later, on March 6, 2014, plaintiffs received notice that their insurance was about to expire. Mr. Cervantes says he contacted Ms. Castro, and it was agreed that she would contact the insurance company directly. *Id*. ¶¶ 62-64. At that time, plaintiffs claim that they were not aware that a notice of default had been recorded. Moreover, they allege that they had been requesting monthly statements since October or November 2012, without success. *Id*. ¶¶ 63-64.

---

[4] Midland Loan Services is alleged to be one of the servicers who received plaintiffs' mortgage payments. Dkt. No. 130 ¶ 18.

7

Several days later, on March 10, 2014, Mr. Cervantes spoke by phone with Ms. Castro about plaintiffs' insurance issues. According to plaintiffs, Ms. Castro advised "out of nowhere" that plaintiffs were six months behind on their mortgage payments. Mr. Cervantes insisted that they missed only two monthly payments and that they had never received any notice that their monthly payments were short. *Id*. ¶¶ 65-66. Although plaintiffs had not been receiving monthly statements, they claim that they continued to make their "regular mortgage payments." *Id*. ¶ 66.

The next day, March 11, 2014, Mr. Cervantes received a letter regarding a Notice of Application of Partial Payment, dated February 12, 2014, which had been sent to an old address in Gilroy. Plaintiffs say that this was the first such notice they received. Then, on March 13, 2014, Mr. Cervantes received mail advising that the Property was scheduled for a short sale pursuant to the notice of default. He called Ms. Castro "to find out what was going on," but she did not answer her phone and Mr. Cervantes left a message asking her to call him back. *Id*. ¶¶ 67-68. She reportedly did not return his call, so Mr. Cervantes conducted a public records search and learned that a notice of default had been recorded on March 6, 2014. *Id*. ¶¶ 69, 77, Ex. C.

On March 13, 2014, Mr. Cervantes sent an email to Ms. Castro, reiterating that plaintiffs wanted to resolve the issues with their past due payments and complaining about the lack of help they received from Ms. Castro and her organization. *Id*. ¶¶ 71-74. Ms. Castro sent a reply email, "just to reflect that she had sent a letter agreement in August of 2013." *Id*. ¶ 75. Based on the tracking number in Ms. Castro's email, Mr. Cervantes says he discovered that her letter was sent to his old address in Gilroy. *Id*.

On March 25, 2014, Mr. Cervantes received a statement advising that, to bring their mortgage current, plaintiffs would have to pay $127,264.81. *Id*. ¶ 76. Elsewhere in the SAC, plaintiffs allege that around that same date, they received a statement from Ms. Castro indicating that they had to pay $137,264.81[5] in order to bring their loan current. *Id.* ¶ 80. Plaintiffs note that this was $17,665.46 more than the $119,599.35 amount reportedly shown on the notice of default recorded on March 6, 2014. *Id.* ¶ 79.

---

[5] It is unclear whether there might be a typographical error as between the $127,264.81 and $137,264.81 figures alleged in the SAC.

8

On June 2, 2014, plaintiffs offered to make "a $25,000 one-time payment and $6,500 monthly payments until [they] g[o]t caught up in order to avoid the foreclosure." *Id*. ¶ 86. In a June 6, 2014 communication, Ms. Castro told plaintiffs that for the past two and a half years, they had been making short payments. Plaintiffs insisted that they were never advised that their payments were short until the notice of default was recorded in March 2014. Plaintiffs claim that they were not given meaningful assistance and that Ms. Castro continued to send mail to their old address in Gilroy. *Id*. ¶¶ 92-105.

On July 8, 2014, Mr. Cervantes emailed Ms. Castro, requesting a loan modification and all the necessary documents. *Id*. ¶ 106. On or around that same date, Ms. Castro advised that the lender was proceeding with a non-judicial foreclosure, and provided a letter denying plaintiffs' request for a loan modification. *Id*. ¶¶ 107-108. At defendant West End Trust's request, a notice of sale was recorded on July 30, 2014. *Id*. ¶ 109.

On September 29, 2014, plaintiffs filed another petition for Chapter 13 bankruptcy. *Id*. ¶ 110. As discussed above, it was during this proceeding that they say the alleged fraudulently altered terms of their loan documents came to light in a declaration Ms. Castro filed with the bankruptcy court. However, plaintiffs claim they did not realize until later that the terms recited in Ms. Castro's declaration were different than what plaintiffs contend are the actual loan modification terms. *Id*. ¶¶ 111-117, 127-129. Additionally, they claim that the West End defendants also filed the same allegedly altered loan documents in the bankruptcy proceeding. *Id*. ¶¶ 118-123, 131-133. Maintaining that they missed only two monthly payments, plaintiffs contend that the past due amount on their loan is much lower than defendants claim and that the disparity is due to the alleged fraudulent alteration of their loan documents.

The Property was sold at a February 3, 2015 foreclosure sale to Donton Construction, Inc. ("Donton"). Plaintiffs now rent the Property from Donton. *Id*. ¶¶ 125-126.

Plaintiffs filed the present lawsuit on October 25, 2017, asserting three claims for relief: (1) "Homeowners Bill of Rights Violations"; (2) "Mortgage Servicing Rules Under the Dodd-Frank Act Violations"; and (3) "Fraud by Altering Loan Documents." Dkt. No. 1. The Bayview defendants and the West End defendants moved to dismiss pursuant to Rule 12(b)(6) for failure to

9

state a claim for relief. Dkt. Nos. 48, 49. In response to those motions, plaintiffs filed a First Amended Complaint ("FAC"), asserting the following four claims for relief: (1) fraudulent alteration of loan documents, (2) negligence, (3) breach of contract, and (4) wrongful foreclosure. Dkt. No. 65. The FAC also added a new defendant, First American Title Insurance Co. (First American").

The Bayview defendants and the West End defendants separately moved to dismiss the FAC pursuant to Rules 12(b)(1) and 12(b)(6). Dkt. Nos. 73, 74. Arguing that the presence of First American destroyed diversity, all defendants moved to dismiss the FAC pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction. All defendants also argued that the FAC should be dismissed pursuant to Rule 12(b)(6) because plaintiffs failed to state sufficient facts supporting a claim for relief. Plaintiffs voluntarily dismissed First American, thereby eliminating defendants' jurisdictional arguments. Dkt. No. 80. Plaintiffs otherwise opposed both motions to dismiss.

The Court granted defendants' respective motions and dismissed the FAC with leave to amend. Dkt. Nos. 128, 129. Plaintiffs timely filed their SAC, asserting the same four claims for relief: (1) fraudulent alteration of loan documents, (2) negligence, (3) breach of contract, and (4) wrongful foreclosure. As noted above, however, the SAC drops several defendants; the first three claims now concern only the remaining Bayview defendants; and the fourth claim for wrongful foreclosure is asserted only against the remaining West End defendants. Dkt. No. 130.

The Bayview defendants contend that the SAC still fails to state a claim for relief and must be dismissed pursuant to Rule 12(b)(6). For the reasons discussed below, the Court grants the motion in part and denies it in part.

**II. LEGAL STANDARD**

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal sufficiency of the claims in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal is appropriate where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory. *Id*. (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)). In such a motion, all material allegations in the complaint must be taken as true and construed in the light most favorable to the claimant. *Id*.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, "the court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." This means that the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, only plausible claims for relief will survive a motion to dismiss. *Iqbal*, 556 U.S. at 679. A claim is plausible if its factual content permits the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id*. A plaintiff does not have to provide detailed facts, but the pleading must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. at 678.

Documents appended to or incorporated into the complaint or which properly are the subject of judicial notice may be considered along with the complaint when deciding a Rule 12(b)(6) motion. *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).

## III. DISCUSSION

### A. Request for Judicial Notice

The Bayview defendants request that the Court take judicial notice of several documents. Dkt. No. 132-1. Although plaintiffs object to that request, their objection appears to concern only defendants' Exhibit F, which are documents purporting to be assignments of the DOT and the Note. Dkt. No. 138.

A court may take judicial notice of facts that are "not subject to reasonable dispute" because they are "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Thus, a court properly may take judicial notice of matters of public record, but cannot take judicial notice of disputed facts contained within such records. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).

For the most part, the Bayview defendants request that the Court take judicial notice of its

own records—namely, plaintiffs' pleadings and the Court's prior orders (Exhibits A-C and G)—which are not controversial. Additionally, the Court finds it appropriate to take judicial notice of portions of Exhibit D to defendants' request, specifically the document titled "Promissory Note," filed as Dkt. No. 132-1 at ECF 149-150. In doing so, however, the Court takes notice of the existence of the document and matters which do not appear to be disputed by the parties.

As for the remaining documents submitted for judicial notice, the Court finds it unnecessary to consider those matters in resolving the present motion and therefore denies the Bayview defendants' request for judicial notice as to those documents.

### B. Claim 1: Fraudulent Alteration of Loan Documents

Plaintiffs claim that defendants BLS and BFA fraudulently altered Section 1(c) of their loan modification agreement regarding their "New Interest Rate." To state a claim for fraud under California law, a plaintiff must allege: (1) a misrepresentation (false representation, concealment, or non-disclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damage. *Lazar v. Super. Ct.*, 12 Cal.4th 631, 638 (1996). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* "A pleading is sufficient under [R]ule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations. While statements of the time, place and nature of the alleged fraudulent activities are sufficient, mere conclusory allegations of fraud are insufficient." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989). "To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (internal quotations and citation omitted).

In granting defendants' motion to dismiss the FAC, the Court agreed that plaintiffs did not plausibly allege facts demonstrating that they were damaged by the alleged alteration. Nevertheless, the Court gave plaintiffs leave to amend their pleading to explain their interpretation

12

of the loan modification agreement—an interpretation which they articulated for the first time at the hearing on defendants' motion to dismiss the FAC. Dkt. No. 128 at 11.

As alleged in the SAC, and as discussed above, plaintiffs' current theory is that the loan modification agreement they signed provided for monthly payments of $4,423.43, with interest calculated based on a 4% rate, plus LIBOR quarterly adjustments, without any additional 5% margin. In plaintiffs' view, this essentially means that they owed much less than defendants claim. Indeed, as suggested by a chart in their SAC, plaintiffs seem to contend that, if their loan payments properly were calculated, then by March 2014 (when the notice of default was recorded) they actually paid $31.57 more than they owed in monthly payments, albeit plaintiffs acknowledge that they still would have owed over $3,400 in late fees on past due amounts. Dkt. No. 130 ¶ 160.

For present purposes, the Bayview defendants do not dispute that the loan modification agreement plaintiffs say they signed contains a different version of Section 1(c) than the one that appears in the alleged sham document. Defendants nevertheless argue that any differences are immaterial because the alleged altered Section 1(c) merely clarifies the terms to which plaintiffs say they agreed. Under defendants' proffered interpretation, plaintiffs' loan modification agreement provided that their interest rate would be fixed at 4% for the first two years, and then would increase 1% each year thereafter, except that the rate could not exceed the 8.89% rate in the original Note. Defendants contend that plaintiffs' loan modification agreement, properly viewed in context together with the original Note, cannot reasonably be interpreted in any other way. Indeed, defendants maintain that plaintiffs would have paid more (not less) under plaintiffs' own interpretation of Section 1(c). *See, e.g.,* Dkt. No. 132 at 16-18. Thus, defendants argue, as they did with respect to the FAC, that the SAC still fails to allege sufficient facts to support a fraud claim, particularly with respect to the element of damages.

At oral argument, the Bayview defendants seemed to acknowledge that the loan modification agreement is capable of the interpretation plaintiffs offer, but only if provisions of the loan documents are read in isolation. Dkt. No. 149. Nevertheless, even assuming that plaintiffs' interpretation of their loan documents is correct, and no matter how plaintiffs claim their monthly payments should have been calculated, defendants emphasize that plaintiffs

13

admittedly missed two monthly payments during the first two years of the loan modification when everyone agrees that the interest rate on their loan was 4%. Thus, the Bayview defendants contend that plaintiffs have not alleged, and cannot plausibly allege, facts demonstrating that the foreclosure of the Property was due to anything other than the fact that they fell behind on their mortgage payments.

The Court is troubled by the circumstances presented in which two versions of the loan modification exist, with different texts, but both bearing plaintiffs' signatures. Plaintiffs insist they only signed one version of the loan modification agreement, and defendants cannot explain why another version exits. Ordinarily, contract interpretation is a question of law for the court. *See Morey v. Vannucci*, 64 Cal. App. 4th 904, 911 (1998). However, in this case, there is a dispute of fact concerning which is the operative loan modification agreement, and a further dispute regarding the interpretation of the loan modification agreement plaintiffs contend they signed. The Court concludes that it is not possible to resolve either of these disputes at the pleading stage. *Id*. at 912-13.

At the motion hearing, plaintiffs argued that, because their payments were incorrectly calculated under the alleged fraudulent version of Section 1(c), they were harmed financially and were precluded from knowing the correct amounts necessary to pay off past due amounts. Here, plaintiffs point to their allegations that they stopped receiving monthly statements around July or August 2012 (despite their repeated requests for statements), as well as other allegations indicating that in June 2014, plaintiffs offered to make a one-time payment of $25,000, plus increased monthly payments of $6,500. *See, e.g.,* Dkt. No. 130 ¶¶ 46-49, 86. While they acknowledge that, even under their own theory, they still would have owed approximately $3,444 in late fees by March 2014, plaintiffs seem to suggest that they were in a position to pay off their past due amounts (or at least a significant portion of those sums) in order to avoid foreclosure.

Defendants note that the SAC's allegations suggest that plaintiffs likely stopped receiving their monthly statements due to the pendency of plaintiffs' bankruptcy proceedings. The Bayview defendants also point out that there are no allegations in the SAC indicating that between June 2009 (when plaintiffs obtained their loan modification) and June 2011 (when they filed their first

14

Chapter 13 bankruptcy case) that there was any failure of accounting as to what plaintiffs actually owed. These are salient points, and it may be that plaintiffs ultimately will not be able to demonstrate that they suffered any damage as a result of defendants' actions. However, these are factual matters that the Court may not resolve at the pleading stage. For present purposes, construing the SAC's allegations in the light most favorable to plaintiffs, the Court concludes that plaintiffs have stated sufficient facts to state a claim for fraud, including that they were harmed by the unauthorized alteration of the interest term in their loan documents and a lack of accurate information about the amounts due during the repayment period. *See, e.g., Tamburri v. Suntrust Mortgage, Inc.*, 875 F. Supp. 2d 1009, 1022-24 (N.D. Cal. 2012) (concluding that the plaintiff stated a claim for fraud where plaintiff alleged that misrepresentations as to the ownership of her loan deprived her of accurate information concerning which defendant she should have contacted to avoid foreclosure). Accordingly, defendants' motion to dismiss this claim is denied.

### C. Claim 2: Negligence

Plaintiffs claim that defendant BLS negligently failed to safeguard the integrity of the loan documents and to maintain the documents in a safe and unaltered condition. *See, e.g.*, Dkt. No. 130 ¶¶ 197-198. "Negligence claims require the following elements: (1) a legal duty of care owed by the defendant to the plaintiff; (2) a breach of that duty; (3) causation; and (4) injury to the plaintiff resulting from the breach." *Geismar v. Ocwen Loan Servicing LLC*, No. 17-cv-02703-JSC, 2018 WL 276813, at *4 (N.D. Cal., Jan. 3, 2018) (citing *Merrill v. Navegar, Inc.*, 26 Cal.4th 465, 500 (2001)).

In their prior motion to dismiss the FAC, defendants argued that the negligence claim was time-barred because it was filed outside the two-year limitations period and that plaintiffs failed to allege facts establishing that defendants owed a duty of care in any event. *See generally Maomanivong v. Nat'l City Mortgage Co.*, No. C13-05433 DMR, 2015 WL 217347, at *7 (N.D. Cal., Jan. 15, 2015) ("'[A]s a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money.'") (quoting *Nymark v. Heart Fed. Sav. & Loan Assn.*, 231 Cal.App.3d 1089, 1096 (1991)). In its order on defendants' prior motion to dismiss the

15

FAC, the Court noted that the parties did not address whether the alleged alteration of plaintiffs' loan modification agreement constitutes a special circumstance giving rise to a duty of care. Dkt. No. 128 at 13. Nevertheless, the Court found the statute of limitations issue dispositive. Even giving plaintiffs the benefit of their claimed delayed discovery of the alleged alteration in May 2015, the Court concluded that the negligence claim was untimely and dismissed it, with leave to amend insofar as plaintiffs believed they could assert a timely claim for relief or a viable basis for tolling the statute of limitations. *Id*.

The Bayview defendants now argue that the SAC's allegations do nothing to change the analysis and that the negligence claim must be dismissed because it is untimely and because plaintiffs fail to allege facts establishing a duty of care. Plaintiffs contend that their negligence claim is governed by a three-year (not two-year) limitations period and that they timely filed their claim. They further contend that a duty of care exists because the alteration of their loan modification agreement cannot be deemed an activity falling within conventional money-lending roles. Even assuming, without deciding, that BLS owed plaintiffs a duty to safeguard their loan documents, plaintiffs' negligence claim is untimely.

At the motion hearing, plaintiffs argued that their claim is governed by California Code of Civil Procedure section 338 because they suffered "property damage." They presumably refer to section 338(b), which provides a three-year limitations period for "[a]n action for trespass upon or injury to real property." Cal. C.C.P. § 338(b). At oral argument, plaintiffs explained that the "property damage" they suffered was the loss of the Property in foreclosure. The three-year limitations period under section 338(b), however, generally applies to cases involving injury to the property itself. *See, e.g., City of Pomona v. SQM N.A. Corp.*, 750 F.3d 1036, 1051 (9th Cir. 2014) (applying section 338(b) to an action for chemical contamination to property). In the context of foreclosure actions, courts apply a two-year limitations period for negligence claims. *See, e.g., Katsch v. JPMorgan Chase*, No. 5:14-cv-04730-BLF, 2015 WL 534584, at *2 (N.D. Cal., Feb. 9, 2015) (applying a two-year limitations period under Cal. C.C.P. § 335.1 to the plaintiff's claim that defendants owed him a duty to provide him with a non-predatory mortgage loan and documents that were not unconscionable).

16

1    As discussed in the Court's prior order on defendants' motion to dismiss the FAC,
2    plaintiffs' negligence claim accrued, at the latest, when Mr. Cervantes says he realized in May
3    2015 that plaintiffs' loan modification agreement had been altered. Dkt. No. 130 ¶¶ 128-129.
4    Plaintiffs' negligence claim, however, was not asserted until well over two years later in March
5    2018, and is untimely. Because plaintiffs have already been given an opportunity to amend this
6    claim, the Court concludes that further amendment would be futile. Accordingly, plaintiffs'
7    negligence claim is dismissed without leave to amend.

### D.    Claim 3:    Breach of Contract

Plaintiffs claim that the alleged alteration of Section 1(c) of their loan modification agreement constitutes a breach of that contract. Dkt. No. 130 ¶ 211. To state a claim for breach of contract, plaintiffs must allege facts showing (1) the existence of a contract with defendants, (2) plaintiffs' performance or excuse for nonperformance, (3) defendants' breach, and (4) resulting damages to plaintiffs. *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).

Defendants previously moved to dismiss this claim, arguing that it was time-barred and that plaintiffs did not adequately allege the second and fourth elements of a claim for breach of contract. The Court declined to dismiss the claim as untimely, but nevertheless agreed that plaintiffs failed to sufficiently plead their performance (or excuse for nonperformance) and resulting damages. Accordingly, plaintiffs' contract claim was dismissed with leave to amend. Dkt. No. 128 at 15.

With respect to plaintiffs' "performance of the contract or excuse for nonperformance," the SAC alleges that, due to Mr. Cervantes' health issues and his inability to work for several months, plaintiffs missed their mortgage payment in December 2010 and subsequently missed a second payment in May 2011. Dkt. No. 130 ¶¶ 44-45. The SAC goes on to allege that plaintiffs were aware that they missed two monthly payments, but "were not giv[en] the opportunity to cure the arrearage by the 'modus operandi' tactics used by Defendant BLS." *Id*. ¶ 210. As for their resulting damages, plaintiffs allege that "[t]he beneficial interest being enforced by a non-debt holder of the DOT harmed the plaintiffs financially." *Id*. ¶ 212. Defendants move to dismiss this claim, once again arguing that the SAC fails to allege sufficient facts (1) excusing plaintiffs'

admitted non-performance of their obligations under the loan modification agreement and (2) demonstrating that the foreclosure of the Property was due to defendants' conduct, rather than plaintiffs' failure to stay current on their mortgage.

"Generally, a plaintiff who has not performed under a contract is foreclosed from suing another for breach of that agreement." *Davoodi v. Imani*, No. C11-0260 SBA, 2011 WL 577414, at *4 (N.D. Cal., Feb. 9, 2011) (citing *Durell v. Sharp Healthcare*, 183 Cal. App.4th 1350, 1367 (2010)). "Performance may be satisfied by 'allegations in general terms,' but a plaintiff must plead excuses for non-performance with specificity." *Ford v. Lehman Bros. Bank, FSB*, No. C12-00842 CRB, 2012 WL 2343989, at *6 (N.D. Cal., June 20, 2012) (quoting *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1389 (1990)).

Plaintiffs seem to contend that they had a viable excuse for their non-performance because they tried to communicate with defendants about curing their default, to no avail. Dkt. No. 137 at 21. They point, in particular, to an email exchange with Ms. Castro. *Id.*; Dkt. No. 130, Ex. C. As the Bayview defendants correctly note, that email string indicates that Ms. Castro was an Asset Manager at defendant LNR Partners, LLC and does not indicate that she ever worked for the Bayview defendants.

Nevertheless, contracts are to be interpreted so as to give effect to the parties' mutual intent, Cal. Civ. Code § 1636, and ambiguities in contractual language are construed against the drafter, *Robinson v. Bank of America*, No. 12-cv-00494-RMW, 2012 WL 1932842, at *4 (N.D. Cal., May 29, 2012). As discussed, the parties dispute which version of the loan modification agreement reflects their intent, and the terms of plaintiffs' loan modification agreement are ambiguous as to how plaintiffs' monthly payments were to be calculated. Viewing the SAC's allegations in a light most favorable to plaintiffs, plaintiffs contend that they might have avoided foreclosure, or at least may have paid a substantial portion of what they owed, had their payments been correctly calculated and had they been informed of the correct amounts due. *See* Dkt. No. 130, ¶¶ 44-87, 210. However, as discussed, these are matters that turn on factual disputes that the Court may not resolve at the pleading stage. For present purposes, the Court concludes that plaintiffs have sufficiently alleged excuse for nonperformance and have stated a claim for breach

18

of contract. *See Robinson*, 2012 WL 1932842, at *4 (concluding that the plaintiff stated a claim for breach of the modification agreement, even though he attempted to tender less than defendants claimed he owed, where the parties' modification agreement was ambiguous as to the amount of his monthly payments). Defendants' motion to dismiss plaintiffs' contract claim therefore is denied.

## IV. CONCLUSION

Based on the foregoing, defendants' motion to dismiss the SAC is granted in part and denied in part as follows:

1. The motion to dismiss plaintiffs' Claim 1 for fraud is denied.
2. The motion to dismiss plaintiffs' Claim 2 for negligence is granted without leave to amend.
3. The motion to dismiss plaintiffs' Claim 3 for breach of contract is denied.

Defendants shall answer the complaint within 14 days from the date of this order. Fed. R. Civ. P. 15(a)(3).

**IT IS SO ORDERED.**

Dated: July 1, 2019

VIRGINIA K. DEMARCHI
United States Magistrate Judge