United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FRANCISCO CERVANTES, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WEST END 3199 REO LLC, et al.,<br><br>Defendants. | Case No.17-cv-06100-VKD<br><br>**ORDER DENYING WEST END DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>Re: Dkt. No. 134 |

Plaintiffs Francisco Cervantes and Maria Elena Velazquez-Cervantes sue for alleged violations of California law in connection with their mortgage loan for certain property located in San Jose, California ("Property"). They claim that after they signed a loan modification agreement, defendants fraudulently altered material terms of the document, which ultimately caused them to lose the Property in foreclosure. The operative Second Amended Complaint ("SAC") asserts four claims for relief: (1) fraudulent alteration of loan documents; (2) negligence; (3) breach of contract; and (4) wrongful foreclosure. The fourth claim for wrongful foreclosure is the sole claim asserted against defendants West End 3199 REO LLC ("West End 3199"), West End Trust 2012-1 ("West End Trust") and LNR Partners, LLC ("LNR").[1] The Court will refer to these defendants collectively, as the "West End defendants." The Court's jurisdiction is based on

---

[1] The SAC no longer names LNR AFIS Asset Services, LLC, Midland Loan Services, Ana G. Castro, or Stacey Barnes as defendants and does not assert any claims against them. Additionally, the first three claims are asserted against only defendants Bayview Fund Acquisitions and Bayview Loan Servicing (collectively, "Bayview defendants"). The Bayview defendants have separately moved to dismiss the SAC (Dkt. No. 132), and the West End defendants have joined in that motion (Dkt. No. 133). The Court addresses the Bayview defendants' motion in a separate order.

1 diversity. 28 U.S.C. § 1332.[2]

2 The West End defendants now move to dismiss the SAC for failure to state a claim for relief, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiffs oppose the motion. Upon consideration of the moving and responding papers, as well as the oral arguments presented, the Court denies the motion.

## I. BACKGROUND

The following background facts are drawn from the SAC and, solely for purposes of resolving the present motion, are deemed true:

In August 2007, plaintiffs purchased the Property and borrowed $540,000 from Lehman Brothers Bank ("Lehman") pursuant to a deed of trust ("DOT") and Promissory Note ("Note"). In conjunction with that transaction, plaintiffs also obtained a loan from the U.S. Small Business Administration in the amount of $432,000. The Property is a two-story, four-unit mixed-use owner-occupied structure. The two upper units are for residential use, and the two lower units are for commercial use. Plaintiffs live at the Property and also operate their business there. Dkt. No. 130 ¶¶ 5-10.

Around May 5, 2009, Lehman assigned the DOT, along with the Note, to defendant Bayview Loan Servicing ("BLS"), effective March 31, 2009. *Id*. ¶¶ 11-12.

Several years later, on January 14, 2013, BLS recorded an assignment of the DOT and Note to Bayview Fund Acquisitions ("BFA"). The assignment is dated August 3, 2012 with an effective date of July 31, 2012. *Id.* ¶ 13.

BFA then assigned the DOT and Note to defendant West End Trust. The assignment is dated August 3, 2012 with an effective date of July 31, 2012, and was recorded on or about January 14, 2013. *Id*. ¶ 14.

On August 6, 2014, West End Trust recorded an assignment of the DOT and Note to

---

[2] As discussed below, First American Title Insurance Company previously was a named defendant, but has since been voluntarily dismissed. All remaining parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

2

defendant West End 3199. The assignment is dated July 23, 2014. *Id*. ¶ 15.

According to the SAC, the Note provided for an adjustable rate mortgage, consisting of 62 fixed monthly payments of $4,353.00 (principal and interest) for the first five years. Beginning in January 2013, plaintiffs would be required to make 298 additional payments, i.e., 297 monthly payments of $4,947.98 (principal and interest), and one final payment of $4,947.10 (principal) in October 2037. *Id*. ¶¶ 23-24. Plaintiffs further allege that, pursuant to a payment clause in the original Note, beginning in January 2013, their monthly payments would be subject to interest rate adjustments based on the London Interbank Offered Rate ("LIBOR") quarterly index, plus a 5% margin. *Id*. ¶¶ 25-26.

In June 2009, after assignment of the DOT and Note to BLS, plaintiffs obtained a loan modification. In an email to plaintiffs, Julie Butera, a BLS Senior Asset Manager, stated that the modified loan terms provided for a 4% fixed interest rate for two years. *Id*. ¶ 29. In a telephone conversation with Ms. Butera, Mr. Cervantes asked what would happen after two years. Ms. Butera reportedly responded that pursuant to the loan modification terms "paragraph (c)," after two years at a 4% interest rate, "[plaintiffs] will have a 1% increase (as maximum) for the remainder of the term." *Id*. ¶ 30. Plaintiffs allege that the executed loan modification agreement with BLS "became part of the modified Note." *Id*. ¶ 32.

Section 1(b) of the modified loan agreement provided that, beginning August 1, 2009, plaintiffs' new monthly payment (principal, interest, and estimated escrow payment) would be $4,423.43:

> (b) New Monthly Payments, Payment Adjustments:
>
> Effective with the Borrower's monthly payment due 08/01/2009, Borrower's monthly principal and interest payment will be $2,871.59. The estimate monthly escrow payment will be $1,551.84. All payments received by Servicer will be credited towards amounts due under the loan.

*Id*. ¶ 33. Plaintiffs allege that while the original Note contained a payment clause providing for adjustments to their monthly payments based on an additional 5% margin, the modified loan agreement did not provide for any additional or further payment adjustments "regarding the margin." *Id*. As such, plaintiffs contend that Section 1(b) of the modified loan replaced the

3

payment section of the original Note and essentially eliminated the additional 5% margin, thereby setting the monthly payment amount at $4,423.43 for the remainder of the loan period.

The SAC goes on to allege that Section 1(c) of the modified loan agreement provided for a new interest rate as follows:

> (c) New Interest Rate
>
> Effective on 07/01/2009, Borrower's rate of interest will be 4.00% and will adjust to the terms of the original note and the note will control the interest rate for the remainder of the term. The annual increase in the interest rate will be capped at 1% for the remainder of the term.

*Id.* ¶ 34. Plaintiffs note that, despite what Ms. Butera stated in her email, the modified loan agreement does not say that the 4% rate applies only for the first two years. While they acknowledge that the original Note provided for adjustments to their interest rate based on the LIBOR quarterly index, as discussed above, plaintiffs contend that the modified loan agreement eliminated the added 5% margin regarding adjustments to their monthly payments. Thus, plaintiffs claim that Section 1(c) of the modified loan means that (1) beginning on October 1, 2009, their interest rate would adjust to 4% plus LIBOR, *without* an additional 5% margin, and (2) any increase in the annual interest rate would be capped at 1%. *Id.* Plaintiffs claim that in the period leading up to the foreclosure of the Property, the LIBOR quarterly index was never more than 1%, and the annual increases in their interest rate never exceeded the 1% cap. *Id.* ¶ 160.

In sum, plaintiffs contend that, properly interpreted, the loan modification agreement provided that, for the remainder of the loan term, their monthly payments would be $4,423.43, and the interest charged on their loan should not have been more than 5% (4% plus LIBOR, up to 1%). The SAC further alleges that the modified loan was set to mature on July 1, 2039, "on which date any unpaid interest and all other sums due shall be paid in full." *Id.* ¶ 35.

Additionally, the loan modification agreement contained the following provisions, essentially prohibiting any changes to the loan modification agreement terms, except by a writing signed by all parties:

4

6. NO OTHER CHANGES

. . . . Nor shall this Agreement in any way impair, diminish, or affect any of the Borrower's rights or remedies in the Security Instrument whether such rights or remedies arise herein or by operation of law. Any inserted terms, changes or additions to this Agreement will immediately render it null and void. Borrower is encouraged to review this Agreement with his/her legal advisor prior to signing it, . . . .

8. NO ORAL MODIFICATION

This Agreement may not be amended or modified in any way except by a written instrument executed by **all** the parties hereto.

*Id*. ¶¶ 36-37.

Plaintiffs allege that sometime between June 23, 2009, when their loan modification agreement was executed, and August 1, 2012, when the DOT and the Note were assigned to West End Trust, the Bayview defendants surreptitiously altered the modified loan agreement. *Id*. ¶¶ 38-43. As discussed above, plaintiffs say that the modified loan agreement they signed contained the following Section 1(c) concerning their interest rate:

(c) New Interest Rate

Effective on 07/01/2009, Borrower's rate of interest will be 4.00% and will adjust to the terms of the original note and the note will control the interest rate for the remainder of the term. The annual increase in the interest rate will be capped at 1% for the remainder of the term.

Dkt. No. 130, Ex. A at ECF 41. They claim that this provision was altered to read as follows:

(c) New Interest Rate

Effective on 07/01/2009 to 07/01/2010, Borrower's rate of interest will be 4.00%. Effective on 07/01/2011, Borrower's rate of interest will be 5.00%. Effective on 07/01/2012, Borrower's rate of interest will be 6.00%. Effective on 07/01/2013, Borrower's rate of interest will be 7.00%. Effective on 07/01/2014, the interest rate will adjust according to the terms of the note and the note will control the interest rate for the remainder of the term (with the exception that the highest interest rate will not exceed 8.89%. The annual increase in the interest rate will be capped at 1% for the remainder of the term).

*Id*., Ex. B at ECF 47. According to the SAC, without plaintiffs' knowledge and "by the means of electronic scissoring/cutting and/or scanning sections of a valid and true document," this altered Section 1(c) was inserted into the loan modification agreement plaintiffs signed. *Id*. ¶ 41.

Plaintiffs claim that, even upon casual observation of the two documents, the alteration is obvious. Aside from the clearly different text, plaintiffs note that the typeface on the alleged altered document seems to have been reduced in order to make the additional language fit within the same page as the modification agreement plaintiffs say they signed. *Id*. ¶ 42, Exs. A, B.

The alleged alteration reportedly was not revealed until October 27, 2014, when Ana Castro, an LNR Partner Asset Manager,[3] submitted a declaration containing the altered provision in one of plaintiffs' then-pending bankruptcy matters. *Id*. ¶ 39. However, plaintiffs contend that they did not realize that this loan term had been altered until sometime around the end of April 2015 or the beginning of May 2015 when Mr. Cervantes reviewed the loan documents. *Id*. ¶¶ 128-129.

Meanwhile, within the first two years of the loan modification period (when all parties seem to agree that the 4% interest rate was in effect), plaintiffs missed two monthly mortgage payments—in December 2010, and then again in May 2011. *Id*. ¶ 44. According to plaintiffs, those two missed payments put them $8,846.86 behind on their monthly payments. *Id*. ¶ 45.

Plaintiffs filed their first Chapter 13 bankruptcy matter on or about June 21, 2011. That case was dismissed around March 25, 2013. Plaintiffs later filed a petition for Chapter 7 bankruptcy on or about July 12, 2013, and that matter was discharged around October 22, 2013. *Id*. ¶ 45. Plaintiffs say that during their bankruptcy proceedings, they did not miss any additional monthly payments. *Id*.

Beginning in July or August 2012, while their Chapter 13 bankruptcy proceeding was still pending, plaintiffs say that they stopped receiving monthly statements. After several months passed without receipt of any statements, plaintiffs say they repeatedly asked for periodic statements so they could resolve issues regarding their past due amounts. Communications with defendants reportedly were unproductive. *Id*. ¶¶ 46-49.

On March 14, 2013, plaintiffs received a list showing the history of their loan payments.

---

[3] Ms. Castro and LNR Partners, LLC are identified among a group of "servicers and/or employees" that reportedly had access to plaintiffs' loan documents and relevant information. Dkt. No. 130 ¶ 19.

6

*Id*. ¶ 48. Although the list did "not [have] much information of the amounts in arrears and additional details related to the loan," Mr. Cervantes noticed that plaintiffs were being charged late fees every month. *Id*.

The SAC indicates that in March 2013, plaintiffs received a statement from the servicer, LNR AFIS Asset Services, LLC, showing that the total past due amount on their loan (including principal, interest, escrow payments and late fees) was $24,666.96. The statement provided a website where plaintiffs could access information about their loan. Plaintiffs registered on the website, but were unable to access information about their mortgage because their loan was "flagged as Special Serviced." *Id*. ¶¶ 51-55. Plaintiffs allegedly were told by Stacey Barnes, a loan specialist at servicer Midland Loan Services,[4] that information for "Special Serviced" loans could not be accessed online. *Id*. ¶ 56.

When Mr. Cervantes asked Ms. Barnes what plaintiffs could do to bring their loan current, Ms. Barnes referred him to Ms. Castro, who as noted above, was an LNR Partner Asset Manager. *Id*. ¶ 58. Plaintiffs allege that they kept calling Ms. Castro for possible solutions to their situation, but she failed to communicate with them in good faith or to inform them about possible foreclosure prevention alternatives. *Id*. ¶¶ 59-60, 63.

In July 2013, plaintiffs received a letter advising that a notice of default would be recorded. Plaintiffs say that they nevertheless continued to make their "regular monthly mortgage payments as scheduled" and were told not to worry when they asked Ms. Castro about a possible repayment plan to resolve their situation. *Id*. ¶¶ 60-61.

Some eight months later, on March 6, 2014, plaintiffs received notice that their insurance was about to expire. Mr. Cervantes says he contacted Ms. Castro, and it was agreed that she would contact the insurance company directly. *Id*. ¶¶ 62-64. At that time, plaintiffs claim that they were not aware that a notice of default had been recorded. Moreover, they allege that they had been requesting monthly statements since October or November 2012, without success. *Id*. ¶¶ 63-64.

---

[4] Midland Loan Services is alleged to be one of the servicers who received plaintiffs' mortgage payments. Dkt. No. 130 ¶ 18.

Several days later, on March 10, 2014, Mr. Cervantes spoke by phone with Ms. Castro about plaintiffs' insurance issues. According to plaintiffs, Ms. Castro advised "out of nowhere" that plaintiffs were six months behind on their mortgage payments. Mr. Cervantes insisted that they missed only two monthly payments and that they had never received any notice that their monthly payments were short. *Id*. ¶¶ 65-66. Although plaintiffs had not been receiving monthly statements, they claim that they continued to make their "regular mortgage payments." *Id*. ¶ 66.

The next day, March 11, 2014, Mr. Cervantes received a letter regarding a Notice of Application of Partial Payment, dated February 12, 2014, which had been sent to an old address in Gilroy. Plaintiffs say that this was the first such notice they received. Then, on March 13, 2014, Mr. Cervantes received mail advising that the Property was scheduled for a short sale pursuant to the notice of default. He called Ms. Castro "to find out what was going on," but she did not answer her phone and Mr. Cervantes left a message asking her to call him back. *Id*. ¶¶ 67-68. She reportedly did not return his call, so Mr. Cervantes conducted a public records search and learned that a notice of default had been recorded on March 6, 2014. *Id*. ¶¶ 69, 77, Ex. C.

On March 13, 2014, Mr. Cervantes sent an email to Ms. Castro, reiterating that plaintiffs wanted to resolve the issues with their past due payments and complaining about the lack of help they received from Ms. Castro and her organization. *Id*. ¶¶ 71-74. Ms. Castro sent a reply email, "just to reflect that she had sent a letter agreement in August of 2013." *Id*. ¶ 75. Based on the tracking number in Ms. Castro's email, Mr. Cervantes says he discovered that her letter was sent to his old address in Gilroy. *Id*.

On March 25, 2014, Mr. Cervantes received a statement advising that, to bring their mortgage current, plaintiffs would have to pay $127,264.81. *Id*. ¶ 76. Elsewhere in the SAC, plaintiffs allege that around that same date, they received a statement from Ms. Castro indicating that they had to pay $137,264.81[5] in order to bring their loan current. *Id.* ¶ 80. Plaintiffs note that this was $17,665.46 more than the $119,599.35 amount reportedly shown on the notice of default recorded on March 6, 2014. *Id.* ¶ 79.

---

[5] It is unclear whether there might be a typographical error as between the $127,264.81 and $137,264.81 figures alleged in the SAC.

8

On June 2, 2014, plaintiffs offered to make "a $25,000 one-time payment and $6,500 monthly payments until [they] g[o]t caught up in order to avoid the foreclosure." *Id*. ¶ 86. In a June 6, 2014 communication, Ms. Castro told plaintiffs that for the past two and a half years, they had been making short payments. Plaintiffs insisted that they were never advised that their payments were short until the notice of default was recorded in March 2014. Plaintiffs claim that they were not given meaningful assistance and that Ms. Castro continued to send mail to their old address in Gilroy. *Id*. ¶¶ 92-105.

On July 8, 2014, Mr. Cervantes emailed Ms. Castro, requesting a loan modification and all the necessary documents. *Id*. ¶ 106. On or around that same date, Ms. Castro advised that the lender was proceeding with a non-judicial foreclosure, and provided a letter denying plaintiffs' request for a loan modification. *Id*. ¶¶ 107-108. At defendant West End Trust's request, a notice of sale was recorded on July 30, 2014. *Id*. ¶ 109.

On September 29, 2014, plaintiffs filed another petition for Chapter 13 bankruptcy. *Id*. ¶ 110. As discussed above, it was during this proceeding that they say the alleged fraudulently altered terms of their loan documents came to light in a declaration Ms. Castro filed with the bankruptcy court. However, plaintiffs claim they did not realize until later that the terms recited in Ms. Castro's declaration were different than what plaintiffs contend are the actual loan modification terms. *Id*. ¶¶ 111-117, 127-129. Additionally, they claim that the West End defendants also filed the same allegedly altered loan documents in the bankruptcy proceeding. *Id*. ¶¶ 118-123, 131-133. Maintaining that they missed only two monthly payments, plaintiffs contend that the past due amount on their loan is much lower than defendants claim and that the disparity is due to the alleged fraudulent alteration of their loan documents.

The Property was sold at a February 3, 2015 foreclosure sale to Donton Construction, Inc. ("Donton"). Plaintiffs now rent the Property from Donton. *Id*. ¶¶ 125-126.

Plaintiffs filed the present lawsuit on October 25, 2017, asserting three claims for relief: (1) "Homeowners Bill of Rights Violations"; (2) "Mortgage Servicing Rules Under the Dodd-Frank Act Violations"; and (3) "Fraud by Altering Loan Documents." Dkt. No. 1. The Bayview defendants and the West End defendants moved to dismiss pursuant to Rule 12(b)(6) for failure to

state a claim for relief. Dkt. Nos. 48, 49. In response to those motions, plaintiffs filed a First Amended Complaint ("FAC"), asserting the following four claims for relief: (1) fraudulent alteration of loan documents, (2) negligence, (3) breach of contract, and (4) wrongful foreclosure. Dkt. No. 65. The FAC also added a new defendant, First American Title Insurance Co. (First American").

The Bayview Defendants and the West End defendants separately moved to dismiss the FAC pursuant to Rules 12(b)(1) and 12(b)(6). Dkt. Nos. 73, 74. Arguing that the presence of First American destroyed diversity, all defendants moved to dismiss the FAC pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction. All defendants also argued that the FAC should be dismissed pursuant to Rule 12(b)(6) because plaintiffs failed to state sufficient facts supporting a claim for relief. Plaintiffs voluntarily dismissed First American, thereby eliminating defendants' jurisdictional arguments. Dkt. No. 80. Plaintiffs otherwise opposed both motions to dismiss.

The Court granted defendants' respective motions and dismissed the FAC with leave to amend. Dkt. Nos. 128, 129. Plaintiffs timely filed their SAC, asserting the same four claims for relief: (1) fraudulent alteration of loan documents, (2) negligence, (3) breach of contract, and (4) wrongful foreclosure. As noted above, however, the SAC drops several defendants; the first three claims now concern only the remaining Bayview defendants; and the fourth claim for wrongful foreclosure is asserted only against the remaining West End defendants. Dkt. No. 130.

The West End defendants move to dismiss the SAC on two grounds. First, they contend that the SAC still fails to state a claim for wrongful foreclosure and must be dismissed pursuant to Rule 12(b)(6). Second, even if plaintiffs have sufficiently pled a wrongful foreclosure claim, the West End defendants argue that the SAC must be dismissed pursuant to Rule 12(b)(7) because plaintiffs have not named two additional parties—First American (the foreclosure trustee) and Donton (the purchaser of the Property at foreclosure)—whom the West End defendants claim are indispensable to these proceedings. For the reasons discussed below, the Court denies the West End defendants' motion to dismiss in its entirety.

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal sufficiency of the claims in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal is appropriate where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory. *Id.* (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)). In such a motion, all material allegations in the complaint must be taken as true and construed in the light most favorable to the claimant. *Id.*

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, "the court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." This means that the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, only plausible claims for relief will survive a motion to dismiss. *Iqbal*, 556 U.S. at 679. A claim is plausible if its factual content permits the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* A plaintiff does not have to provide detailed facts, but the pleading must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678.

Documents appended to or incorporated into the complaint or which properly are the subject of judicial notice may be considered along with the complaint when deciding a Rule 12(b)(6) motion. *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).

### B. Rule 12(b)(7)

Rule 12(b)(7) permits a party may move to dismiss a case for "failure to join a party under Rule 19." Fed. R. Civ. P. 12(b)(7). Rule 19 prescribes a three-step inquiry: (1) whether the absent party is necessary; (2) if so, whether it is feasible to order that absent party to be joined; and

1 (3) if joinder is not feasible, whether the case can proceed without the absent party, or whether the absent party is indispensable such that the action must be dismissed. Fed. R. Civ. P. 19(a); *Salt River Project Agric. Improvement & Power Dist. v. Lee*, 672 F.3d 1176, 1179 (9th Cir. 2012). In determining whether Rule 19 requires joinder of additional parties, a court may consider evidence outside the pleadings. *See generally McShan v. Sherrill*, 283 F.2d 462, 464 (9th Cir. 1960). The party moving for dismissal under Rule 12(b)(7) "bear[s] the burden in producing evidence in support of the motion." *Biagro Western Sales, Inc. v. Helena Chem. Co.*, 160 F. Supp. 2d 1136, 1141 (E.D. Cal. 2001) (citing *Citizen Band Potawatomi Indian Tribe of Okla. v. Collier*, 17 F.3d 1292, 1293 (10th Cir. 1994)).

## III. DISCUSSION

### A. Request for Judicial Notice

The West End defendants request that the Court take judicial notice of a considerable number of documents outside the pleadings. Dkt. Nos. 136, 145. Plaintiffs object to those requests. Dkt. Nos. 140, 146. A court may take judicial notice of facts that are "not subject to reasonable dispute" because they are "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Thus, a court properly may take judicial notice of matters of public record, but cannot take judicial notice of disputed facts contained within such records. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).

For purposes of resolving defendant's Rule 12(b)(6) motion, the Court finds it unnecessary to consider the documents submitted by the West End defendants and therefore denies their request for judicial notice.[6] Moreover, several documents appear to have been submitted for the purpose of disputing factual matters asserted in the complaint (*see, e.g.,* Dkt. No. 134 at 13) and therefore are not appropriate subjects for judicial notice.

---

[6] As discussed below, in ruling on defendants' Rule 12(b)(7) motion to dismiss, the Court has considered a document outside the pleadings concerning Donton's status as a California corporation. Dkt. No. 136-5 at ECF 80-81.

12

**B. Whether Defendants' Motion to Dismiss Is Untimely**

Preliminarily, plaintiffs argue that the present motion to dismiss should be denied as untimely, arguing that pursuant to Civil Local Rule 7-2(a), the motion should have been filed no later than February 14, 2019, i.e., 14 days from the *filing* of the SAC. Because the West End defendants did not file their motion until February 19, 2019, plaintiffs contend that it was filed five days too late. The West End defendants point out that under Rule 15(a), their response to the complaint was due within 14 days from *service* of the SAC. *See* Fed. R. Civ. P. 15(a)(3) ("Unless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later."). Because plaintiffs did not e-file their SAC, and served the document by mail, defendants contend that they were entitled to the benefit of four additional days (i.e., three for service of the SAC by mail and one additional day to account for the Presidents Day holiday), giving them until February 19 to file the present motion. *See* Fed. R. Civ. P. 6(a), (d). Additionally, they note that the present motion was filed more than the minimum 35 days in advance of the noticed hearing, as required by this district's Civil Local Rule 7-2(a).

Notwithstanding that plaintiffs apparently served the SAC by mail, the docket reflects that defendants received electronic notice of that filing when the SAC was docketed by the Clerk's Office on February 1, 2019. Nevertheless, even assuming that the present motion was untimely, the Court finds that the delay of several days did not prejudice the plaintiffs, particularly when the motion was filed well over 35 days before the noticed hearing date. Moreover, the Court prefers to resolve matters on the merits. Accordingly, the Court has accepted and considered the West End defendants' motion.

**C. Rule 12(b)(6) Motion to Dismiss**

Plaintiffs' wrongful foreclosure claim is based on the alleged fraudulently altered loan modification agreement, a document they insist they never signed. In essence, plaintiffs allege that the Bayview defendants' assignment of the beneficial interest in the DOT and Note to the West End defendants, and the West End defendants' subsequent foreclosure of their home, were tainted by fraud. Plaintiffs claim that the West End defendants therefore had no authority to

foreclose on the Property. Dkt. No. 130 ¶¶ 217-255.  Additionally, plaintiffs claim that the West End defendants failed to deal with them reasonably and in good faith when plaintiffs tried to communicate with them about their loan.  *Id*. ¶¶ 256-260.

The elements of a tort claim for wrongful foreclosure track the elements of an equitable claim to set aside a foreclosure sale.  *Miles v. Deutsche Bank Nat'l Trust Co.*, 236 Cal. App. 4th 394, 408 (2015).  In order to successfully state a claim for wrongful foreclosure, plaintiffs must plead that (1) the trustee or mortgagee caused an illegal, fraudulent, or willfully oppressive sale of real property pursuant to a power of sale in a mortgage or deed of trust; (2) plaintiffs were prejudiced or harmed; and (3) they tendered the amount of the secured indebtedness or were excused from tendering.  *Lona v. Citibank, N.A.*, 202 Cal. App.4th 89, 103 (2011).

In its order on the West End defendants' prior motion to dismiss the FAC, the Court concluded that the tender requirement did not appear to apply, inasmuch as the amount of plaintiffs' indebtedness is a key contested issue.  Dkt. No. 129 at 14.  Accordingly, the third prong is not at issue on the present motion, and the West End defendants now focus on the first two elements of a wrongful foreclosure claim.

With respect to the first element, defendants argue that the SAC fails to state facts demonstrating an illegal, fraudulent, or willfully oppressive sale of real property because consumer protection standards, such as those enacted under the California Homeowners' Bill of Rights, Cal. Civ. Code §§ 2920, *et seq*., do not apply to plaintiffs' loan, which the West End defendants maintain is a commercial loan, and not a residential consumer loan.  In any event, the West End defendants argue that there is a logical explanation for the lack of communication or miscommunication alleged in the SAC, and that there is no basis to conclude that any such actions were conducted in bad faith.

Although defendants maintain that statutory foreclosure prevention measures do not apply to plaintiffs' loan, they do not cite authority for the proposition that they were not required to deal with plaintiffs reasonably and in good faith with respect to their loan.  While defendants may have a reasonable explanation for conduct alleged in the SAC, at this stage of the proceedings the Court must take the SAC's material allegations as true and construe them in the light most favorable to

14

plaintiffs. *Navarro*, 250 F.3d at 732.

In any event, courts have recognized that a plaintiff may state a claim for wrongful foreclosure where the foreclosure sale is based on underlying loan documents that are illegal or unconscionable or were procured by fraud. *See, e.g., Lona*, 202 Cal. App. 4th at 103 (reversing summary judgment entered in favor of the defendant lender and loan servicer in an action to set aside a trustee's sale, where the plaintiff presented evidence that the underlying loan documents were unconscionable and void for illegality at the time of signing); *Zahabi v. Bank of America, N.A.*, No. C12-00014 RS, 2013 WL 12173749, at *3 (N.D. Cal., Feb. 7, 2013) (concluding that the plaintiff stated a wrongful foreclosure claim based on loan documents that allegedly were procured through fraud). As discussed in the Court's separate order on the Bayview defendants' motion to dismiss the SAC, plaintiffs have alleged sufficient facts to proceed with their fraud claim based on the alleged alteration of their loan modification agreement. With respect to the West End defendants, plaintiffs allege that Note that BFA assigned to West End Trust was *not* the Note with the modified payment terms that plaintiffs signed, but instead a fraudulently altered Note with different payment terms. The Court concludes that the SAC alleges sufficient facts to support plaintiffs' claim of fraud in the sale of the property at issue, thus satisfying the first element for a wrongful foreclosure claim.

While the West End defendants acknowledge that borrowers may bring wrongful foreclosure actions based on allegations that the foreclosing party lacked authority to foreclose due to a void assignment,[7] defendants nevertheless contend that the SAC fails to allege prejudice beyond the foreclosure itself. Although it is not an entirely settled matter, several courts have recognized that the weight of California appellate authority holds that in order to state a wrongful foreclosure claim, a plaintiff must allege additional prejudice or harm from a void assignment, *e.g.*, the void assignment changed the borrower's payment obligations or interfered with the borrower's payment. *Cardenas v. Caliber Home Loans, Inc.*, 281 F. Supp. 3d 862, 872 (N.D. Cal. 2017) (citing cases). In other words, a borrower must allege facts demonstrating that absent the

---

[7] Defendants do not address the distinction between void assignments and those that are merely voidable.

15

fraudulent conduct the foreclosure sale would not have occurred. *Williams v. Quality Loan Servs. Corp.*, No. 14-cv-02228-JCS, 2014 WL 5324102, at *6 (N.D. Cal., Oct. 17, 2014). As discussed in the separate order on the Bayview defendants' motion to dismiss the SAC, plaintiffs have stated sufficient facts to support their claim that, due to the alleged fraud in their underlying loan documentation, their monthly payments were incorrectly calculated, they were harmed financially, they were precluded from knowing the correct amounts necessary to pay off past due amounts, and the amount due at the time of the foreclosure was less than what defendants demanded. The Court is not able to conclude that, as a matter of law, plaintiffs would not have avoided foreclosure had the Note, as modified by the loan modification agreement plaintiffs actually signed, been assigned to the West End defendants.

Accordingly, the Court concludes that plaintiffs have sufficiently alleged prejudice beyond the foreclosure itself, and the West End defendants' Rule 12(b)(6) motion to dismiss is denied.

### D. Rule 12(b)(7) Motion to Dismiss

The West End defendants nevertheless argue that the wrongful foreclosure claim must be dismissed because plaintiffs failed to join First American, the foreclosure trustee, and Donton, the purchaser of the Property at foreclosure. Defendants contend that First American and Donton are indispensable to this litigation, and that Donton cannot be added to this litigation without destroying federal subject matter jurisdiction.[8]

As discussed above, in determining whether dismissal is appropriate under Rule 19, the Court engages in a three-step inquiry: (1) whether the absent party is necessary; (2) if so, whether it is feasible to order that absent party to be joined; and (3) if joinder is not feasible, whether the case can proceed without the absent party, or whether the absent party is indispensable such that the action must be dismissed. Fed. R. Civ. P. 19(a); *Salt River Project Agric. Improvement &*

---

[8] As noted above, plaintiffs initially named First American as a defendant in their FAC, but later voluntarily dismissed First American after defendants took the position that First American was a California corporation whose presence would destroy diversity jurisdiction. Dkt. Nos. 73 at ECF 9; Dkt. No. 74 at ECF 12. The West End defendants now say that First American is a Nebraska corporation. Dkt. No. 134 at ECF 25. Diversity jurisdiction is measured at the time a lawsuit is filed. *See generally Grup Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 571 (2004). For the reasons discussed above, however, the Court concludes that the West End defendants have not met their burden of establishing that First American is a necessary party.

16

1 | *Power Dist.*, 672 F.3d at 1179. Defendants bear the burden of demonstrating that dismissal is warranted under Rule 12(b)(7). *Biagro*, 160 F. Supp. 2d at 1141.

A party is necessary if "in that person's absence, the court cannot accord complete relief among existing parties"; or if "that person claims an interest relating to the subject of the action and is so situated such that disposing of the action" would either "impair or impede the person's ability to protect the interest" or "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1).

The West End defendants argue, persuasively, that to the extent plaintiffs seek to set aside the foreclosure sale, First American and Donton are indispensable parties. *See, e.g., Washington Mutual Bank v. Blechman*, 157 Cal. App. 4th 662 (2007) (concluding that the lender and foreclosure trustee were indispensable parties to the borrower's prior lawsuit against the purchaser to set aside the foreclosure sale). Moreover, defendants have submitted documentation indicating that since 1989, Donton has been a California corporation, whose joinder in the present action would destroy diversity jurisdiction. Dkt. No. 136-5 at 80-81.

However, it is not clear what relief plaintiff seek on the wrongful disclosure claim against the West End defendants. The SAC demands many forms of relief, including unspecified "equitable relief" and relief in the form of money damages. Dkt. No. 130 at 37. Because wrongful foreclosure is a tort, conventional tort damages are available, in addition to a remedy setting aside the foreclosure sale. *See Miles*, 236 Cal. App. 4th at 409 (observing that "wrongful foreclosure is a tort, and the measure of damages is the familiar measure of tort damages: all proximately caused damages.") (citation omitted). As far as this Court is aware, neither First American nor Donton has claimed an interest relating to the subject matter of this action, and the West End defendants have not demonstrated that, with respect to any money damages to which plaintiffs may be entitled, the Court cannot accord complete relief among existing parties as to their respective roles in the conduct alleged.

Accordingly, the West End defendants have not demonstrated that the claim must be dismissed for failure to join an indispensable party, and defendants' Rule 12(b)(7) motion to

17

dismiss is denied.

## IV. CONCLUSION

Based on the foregoing, the Court denies the West End defendants' motion to dismiss the wrongful foreclosure claim. Defendants shall answer the complaint within 14 days from the date of this order. Fed. R. Civ. P. 15(a)(3).

**IT IS SO ORDERED.**

Dated: July 1, 2019

VIRGINIA K. DEMARCHI
United States Magistrate Judge